<u>**AFFIDAVIT OF SPECIAL AGENT ADAM RAYHO IN SUPPORT OF SEIZURE WARRANTS**</u>

I, Special Agent Adam Rayho, being duly sworn, hereby declare as follows:

***INTRODUCTION AND AGENT BACKGROUND***

1.     I am a Special Agent with Homeland Security Investigations ("HSI") assigned to the Boston Field Office and have been employed by HSI since May 2023.  My primary responsibility is as a criminal investigator assigned to the Cyber Crimes Group.  As a member of the Cyber Crimes Group, I investigate crimes that have a nexus to the clearnet or dark web.

2.     Before becoming an HSI Special Agent, I was a detective with the Nashua, New Hampshire, Police Department, and a deputized task force officer ("TFO") for HSI.  I became a certified police officer in the State of New Hampshire in May 2014 after graduating from the 164th New Hampshire Police Standards and Training Academy.  I hold a bachelor's degree in criminal justice, with a minor in computer science and victimology, from Endicott College.

3.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4.     During my career, I have participated in investigations involving the illegal counterfeiting, importation, manufacturing, distribution, and trafficking of contraband such as firearms and trademarked items.

5.     As part of my duties, I am currently participating in an investigation into various websites that are selling items that infringe on a trademark held by Glock, Inc.  Once purchased, the contraband items are shipped from China into the United States.  The advertisement, sale, and importation of these items violate 18 U.S.C. § 545 (Smuggling goods into the United States) and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods or services).

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

### PURPOSES OF THE AFFIDAVIT

7.     I am submitting this affidavit in support of applications for criminal warrants to seize the following property, referred to herein as the **"Target Accounts"** and further described in Attachments A-1 and A-2:

- **Entire contents of OKX Account Number** ███████ **724**
- **Entire contents of OKX Account Number** ███████ **317**

8.     This affidavit is also presented in support of applications for seizure warrants for the following Internet domains, referred to herein as the **"Subject Domains"** and further described in Attachments A-3 and A-4:

- happyglockswitch[.]xyz[1] (**"Subject Domain 1"**), which is registered with NameSilo, LLC in the United States, a company located in Phoenix, Arizona, and for which the registry for the top-level domain is XYZ.com LLC, a company in Las Vegas, Nevada; and

- happygswitch[.]com (**"Subject Domain 2"**), which is registered with Name SRS AB in Sweden and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia

9.     As set forth below, there is probable cause to believe that the **Target Accounts** and **Subject Domains** are property used, or intended to be used to commit, or to facilitate the commission of violations of federal law, including: 18 U.S.C. § 545 (Smuggling goods into the United States), and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods or services).

---

[1] Throughout this affidavit I have placed brackets (*e.g.*, "[.]com") within the domain names and email addresses of targets and/or subjects of the investigation. These brackets, referred to as "blocks," are designed to prevent inadvertent connections.

2

10.    Pursuant to 19 U.S.C. § 1595a(a) (Aiding unlawful importation), a customs statute that sets forth seizure and forfeiture authority for property used to facilitate the importation of illegal articles into the United States:

> [E]very vessel, vehicle, animal, aircraft, or other thing used in, to aid in, or to facilitate, by obtaining information or in any other way, the importation . . . of any article which is being or has been introduced, or attempted to be introduced, into the United States contrary to law . . . may be seized and forfeited[.]

Because the **Target Accounts** and **Subject Domains** are being used to facilitate the importation of machine gun conversion devices ("MCDs") into the United States in violation of 18 U.S.C. § 545—*i.e.*, "contrary to law"—they are subject to forfeiture.

11.    In addition to 19 U.S.C. § 1595a(a), which specifically references both seizure and forfeiture authority, 19 U.S.C. § 1603(a) provides:

> Any property which is subject to forfeiture to the United States for violation of the customs laws . . . may be seized by the appropriate officer or person upon process issued in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.  This authority is in addition to any seizure authority otherwise provided by law.

12.    Pursuant to 18 U.S.C. § 2323(a)(1)(B), any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 (Trafficking in counterfeit goods) is subject to civil forfeiture to the United States.

13.    Pursuant to 18 U.S.C. § 2323(b)(1), any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 is also subject to criminal forfeiture to the United States.

14.    This Court has authority to issue a seizure warrant, pursuant to 18 U.S.C. § 981(b)(2), incorporated by 18 U.S.C. § 2323(a)(2), which states that "seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."

15.    Pursuant to 28 U.S.C. § 1355(b), district courts have original jurisdiction for forfeiture proceedings in the district in which any of the acts or omissions giving rise to the forfeiture occurred. This Court has jurisdiction to issue the requested seizure warrants because acts and omissions in furtherance of the offenses under investigation occurred within Massachusetts. Specifically: 1) funds were sent from Massachusetts to the **Target Accounts,** and the contraband items purchased with the funds were shipped to Massachusetts; and 2) the **Subject Domains** were accessed from Massachusetts and the contraband items purchased from the **Subject Domains** were shipped to Massachusetts.

16.    Based on my training and experience, neither a restraining order nor an injunction is sufficient to guarantee the availability of the **Target Accounts** for forfeiture because, as discussed in more detail below, the funds may be easily withdrawn, transferred, dissipated, or otherwise made unavailable.

17.    Based on my training and experience, neither a restraining order nor an injunction is sufficient to guarantee the availability of the **Subject Domains** for forfeiture because, as discussed in more detail above, the owners of the **Subject Domains** have the ability to move them to another computer/server or a third-party hosting service outside of the United States beyond this Court's jurisdiction to anywhere in the world.  In addition, by seizing the **Subject Domains**, the government will prevent the continued use of those websites to commit the violations of federal law described in this affidavit.

### PROCEDURAL HISTORY

18.    On April 21, 2025, the Honorable Paul G. Levenson, United States Magistrate Judge for the District of Massachusetts, issued seizure warrants for four internet domains. <u>See</u> 25-mj-8306-8309-PGL. In sum and substance, the affidavits in support of the warrants outlined undercover purchases of MCDs and four websites used to facilitate the sale of MCDs.

### BACKGROUND

<u>Importation of MCDs Violates Federal Law</u>

19.    Machine gun conversion devices ("MCDs") are parts designed to convert semiautomatic pistols or semiautomatic rifles into fully automatic machine guns.  Such parts are commonly referred to as "Glock switches[2]" or "auto sears."  Possession of these items and their importation from certain countries, including China, are prohibited under the National Firearms Act ("NFA"), 26 U.S.C. §§ 5861 and 5845,[3] along with 27 C.F.R. Part 447, in which the United States prohibits imports of Chinese defense articles into the United States if the item is covered by the United States Munitions "Import" List.[4]

20.    Specifically, pursuant to 26 U.S.C. § 5845(a)(6), the term "firearm" is defined to include a "machinegun."  In turn, the term "machinegun" is defined by 26 U.S.C. § 5845(b) as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

21.    When inserted into a firearm, "Glock switches" and "auto sears" meet the definition of a "machinegun"—and thus, they also meet the definition of a "firearm" under 26 U.S.C.

---

[2] HSI agents have spoken with representatives of Glock, Inc., who advised they have never made a device capable of being inserted into the rear of a pistol to make the firearm function as fully automatic.  Thus, while commonly referred to as a "Glock switch," such MCDs are not in fact manufactured by Glock, Inc., despite frequently being embossed with the Glock, Inc. logo or sold on websites which use the trademarked Glock name or branding.

[3] <u>See</u> <u>also</u> 18 U.S.C § 922(o).

[4] The U.S. Munitions Import List includes "[a]utomatic firearms and all components and parts for such firearms to caliber .50 inclusive," as well as "[f]irearms silencers and suppressors, including flash suppressors."  <u>See</u> 27 C.F.R. § 447.21 at Category I, subsections b, d.

§ 5845(a)(6)—as they allow the individual more than one shot without manual reloading.

22.    Pursuant to 26 U.S.C. § 5844:

No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction unless the importer establishes, under regulations as may be prescribed by the Secretary, that the firearm to be imported or brought in is-

(1) being imported or brought in for the use of the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof; or

(2) being imported or brought in for scientific or research purposes; or

(3) being imported or brought in solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer;

except that, the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with classifying the firearm.

23.    Pursuant to 26 U.S.C. § 5861, it is unlawful for any person to "(e) to transfer a firearm in violation of the provisions of this chapter"; "(f) to make a firearm in violation of the provisions of this chapter"; "(j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter;" or "(l) to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false."

24.    This investigation has revealed that multiple individuals and/or companies in China have imported firearms into the United States without following the regulations under 26 U.S.C. § 5844 described above. The individuals and/or companies in China also violated 26 U.S.C. §§ 5861(e) by transferring a firearm, (f) making a firearm, (j) transporting or delivering a firearm in interstate commerce which had not been registered as required, and (l) to make or cause the making of, a false entry on any application, return or record required by the chapter.

25.    The MCDs at issue throughout this affidavit—including Glock switches and auto sears—were imported into the United States in violation of the provisions of the NFA, as discussed

above. Their importation thus violates 18 U.S.C. § 545 (Smuggling goods into the United States),

which makes it illegal to import into the United States "any merchandise contrary to law."

The Trafficking of Counterfeit Goods Violates Federal Law

26.     Federal law further prohibits the trafficking of counterfeit goods or services. Pursuant

to 18 U.S.C. § 2320(a)(1), "whoever intentionally traffics in goods or services and knowingly uses a

counterfeit mark on or in connection with such goods or services"—or attempts or conspires to do

so—shall be punished according to law. In this context, the term "traffic" means "to transport, transfer,

or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or

to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise

dispose of." 18 U.S.C. § 2320(f)(5).

27.     The term "counterfeit mark" is defined as:

> (A) a spurious mark—

>> (i) that is used in connection with trafficking in any goods, services, labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature;

>> (ii) that is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered;
>> (iii) that is applied to or used in connection with the goods or services for which the mark    is registered with the United States Patent and Trademark Office, or is applied to or consists of a label, patch, sticker, wrapper, badge, emblem, medallion, charm, box, container, can, case, hangtag, documentation, or packaging of any type or nature that is designed, marketed, or otherwise intended to be used on or in connection with the goods or services for which the mark is registered in the United States Patent and Trademark Office; and

>> (iv) the use of which is likely to cause confusion, to cause mistake, or to deceive.

18 U.S.C. § 2320(f)(1)(A).

28.     As discussed herein, the **Target Accounts** have been used to facilitate either the

trafficking in counterfeit goods or the attempt or conspiracy to do so. The particular **Target Accounts** at issue sell merchandise that violate a trademark that Glock, Inc., registered in relation to component parts for firearms.

29.     Specifically, by placing the emblem reproduced below on merchandise, the sellers of the items are portraying that the item sold was made by Glock, Inc., which it was not.



30.     As discussed herein, certain of the **Subject Domains** have been used to facilitate either the trafficking in counterfeit goods or the attempt or conspiracy to do so. The particular **Subject Domains** at issue violate a trademark held by Glock, Inc., which was registered in relation to component parts for firearms. Specifically, by placing the above Glock emblem on merchandise, the sellers of the items procured through certain of the **Subject Domains** are portraying that the item sold was made by Glock, Inc., which it was not.

<u>Background Regarding Virtual Currencies and Virtual Currency Exchanges</u>

31.     Virtual currencies ("cryptocurrency") are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Unlike traditional fiat currencies, virtual currencies are not issued by any government or bank but rather are generated and controlled through computer software.

32.     Virtual currency is stored in a virtual account called a wallet. Wallets are software

programs that interface with blockchains[5] and generate and store public and private keys used to send and receive cryptocurrency.  A public key, or public address, is akin to a bank account number, and a private key, or private address, is akin to a personal identification number ("PIN") or password that allows a user to access and transfer value associated with the public address or key.

33.    Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, tether, or "USDT," is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. As of November 19, 2025, 1 USDT was worth approximately $1.00.

34.    Ether, or "ETH," is cryptocurrency created by a collection of individuals that is part of the Ethereum blockchain.

35.    Payments made with cryptocurrencies, like USDT and ETH, are recorded in a public ledger that is maintained by peer-to-peer verification, such as a blockchain, and is thus not maintained by a single administrator or entity.

36.    Individuals can acquire USDT, ETH and other cryptocurrencies through, for example, exchanges (i.e., websites that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies), ATMs, or directly from other people. Cryptocurrency "exchanges" are clearinghouses that allow for exchange between different types of cryptocurrencies, or between cryptocurrency and fiat currency (e.g., U.S. dollars). Some exchanges also allow users to create accounts and store cryptocurrency with the exchange, like a bank account. In those instances, the cryptocurrency is often stored in an address or series of addresses owned and controlled by the exchange operator. Cryptocurrency exchanges operate both inside and outside of the United States.

---

[5] Blockchains are digital ledger databases that record transactions in a sequence of blocks, which are then distributed across a network of participating computers.

Popular cryptocurrency exchanges available to U.S. residents include Coinbase, Kraken, and Gemini.

37.    OKX is a cryptocurrency exchange based in the Seychelles. Although it is one of the largest cryptocurrency exchange platforms in the world based on trading volume, U.S. residents are barred from using OKX due to various regulatory restrictions.

38.    Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a public ledger, the true identities of the individuals or entities behind the public addresses are not recorded on the public ledger. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Tether, Bitcoin, and Ethereum-based transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.

39.    Blockchain explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer uses a database to arrange and present the data to a user in a searchable format.

<u>Background on Domain Names</u>

40.    Based on my training and experience, I know that domain names are part of a system employed to identify computers on the Internet, using a series of characters (e.g., letters, numbers, or other symbols) that correspond with a particular IP address.[6]    For example, "<u>usdoj.gov</u>," "<u>Wikipedia.org</u>," and "<u>Reddit.com</u>" are all domain names.

---

[6] Based on my training and experience, I know that an "IP address," or "Internet Protocol address," is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. The assignment of IP addresses to computers connected to the Internet is controlled by Internet service providers.

41.     I further know that the domain name system ("DNS") is, among other things, a hierarchical convention for domain names. Specifically, domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "example.com" or "example.net." The hierarchy of domains descends from right to left. Using this system, each label to the left specifies a subdivision, or subdomain, of the domain on the right. The right-most label conveys the "top-level" domain. For instance, the domain name "example.com" means the computer assigned that name is in the ".com" top-level domain, and the "example" is the second level domain and represents a specific web server.[7]

42.     I further know that for each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address. For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc., which has its headquarters at 21355 Ridgetop Circle, Dulles, Virginia.

43.     Domain names may be purchased through a "registrar," which acts as the intermediary between the registry and the purchaser of the domain name. The individual or business that purchases a domain name from a registrar is called a "registrant." Registrants can either host the domain or utilize a third-party service provider to resolve the domain name to an IP address. Thus, a registrant can move a domain name to another computer/server or a third-party hosting service anywhere in the world.

### *STATEMENT OF PROBABLE CAUSE*

#### Background of the Investigation

44.     In August 2023, the Homeland Security Investigations ("HSI") New England ("NE") Cyber Crimes Group began targeting multiple clearnet websites, businesses, and individuals who are

---

[7] Based on my training and experience, I know that a web server is a computer that stores web server software and a website's components. A web server connects to the Internet and supports physical data interchange with other devices using the web.

selling, offering for sale, importing, and exporting MCDs and fire control units ("FCUs")[8] in violation of federal law. In furtherance of this investigation, an HSI agent acting in an undercover capacity (the "UC") communicated with MCD vendors who directed the UC to visit the **Subject Domains**. The UC visited and interacted with the **Subject Domains** throughout the investigation and observed the content present at the **Subject Domains**. These visits and interactions confirmed the nature, functionality, and purpose of the **Subject Domains**. As reflected below, that purpose has been to promote the sale of NFA-prohibited items.

45.    Based on the investigation to date, investigators believe there is one Transnational Criminal Organization ("TCO") responsible for the MCDs referenced in this affidavit. During the investigation, the UC communicated with members of this TCO (the "MCD Vendors") via multiple messaging applications, including iMessage, Telegram, WhatsApp, and Signal.

<u>Identification of TCO Members/MCD Vendors</u>

46.    On or about March 3, 2025, the HSI NE Cyber Crimes Group conducted an undercover purchase of one MCD from cnszzhs[.]com.[9] Following the purchase, an HSI NE agent working in an undercover capacity (the "UC") received an email that showed their payment had been processed by PayPal and was associated with a PayPal account. With Paypal's assistance, HSI NE identified the PayPal account associated with this purchase.

47.    HSI NE served PayPal with a summons to identify the user of the PayPal account. Documents provided by PayPal included a Chinese Identification Card used in the Know Your

---

[8] According to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), an FCU is considered a firearm as defined in 26 U.S.C. § 5845(a)(6) but is not considered an MCD. Rather, an FCU is the frame that contains the majority of the key functional parts of a Sig Sauer semi-automatic pistol, such as the trigger, sear, and slide catch lever.

[9] On April 21, 2025, HSI seized the domain cnszzhs[.]com via a seizure warrant from the District of Massachusetts (25-MJ-8308-PGL).

Customer ("KYC") authentication of the account. The identification card, when translated, showed that the individual depicted on the card was Shen LIU (YOB: 1996).

48.     On or about May 19, 2025, the UC conducted an undercover purchase of one MCD from **Subject Domain 1**. Following the purchase, the UC received an email which showed their payment had been processed by PayPal and was associated with a PayPal account. With PayPal's assistance, HSI NE identified the PayPal account associated with this purchase.

49.     HSI NE served PayPal with a summons to identify the user of the PayPal account. Documents provided by PayPal included a Chinese Identification Card used in the KYC authentication of the account. The identification card was translated and showed the individual was Dong LI DENG (YOB: 1997).

<u>May 2025: The UC Conducted an Undercover Purchase from **Subject Domain 1.**</u>

50.     In May 2025, when the UC visited **Subject Domain 1**,[10] the following occurred:

   a.   Upon visiting **Subject Domain 1**, the UC observed a banner that directed customers to contact "customer service" via Signal or WhatsApp. Additionally, a pop-up displayed several MCDs.

   b.   Once the UC exited the pop-up, the website required a login. The UC was able to login using the same credentials as they had previously used on cnszzhs[.]com, which, as noted above, HSI seized on April 21, 2025, Massachusetts (25-MJ-8308-PGL).

   c.   While reviewing the website, the UC observed several MCDs commonly known as "Glock switches" or "Auto Sears" for sale. Furthermore, some of the MCDs displayed Glock, Inc.'s trademarked logo.

51.     On or about May 19, 2025, the UC conducted an undercover purchase of one MCD from **Subject Domain 1**. The UC visited **Subject Domain 1** and observed a picture of an MCD with the title, "Fully automatic selector CNC Glock switch Happy switch fits most models gen1-4 giegle switch 5 colors available."

_____

[10] Screenshots of the Subject Domains are included in Attachments A-3 and A-4.



Upon clicking on the link, the UC observed several different colors/types of MCDs available to include: black, blue, gold, purple, green, rose gold, Ablack Type 3, flat back, and hidden flat back. Associated with the MCD listing was the following information.

> The glock switch can be used to switch the firing mode of the glock pistol, freely switching between full-automatic and semi-automatic modes. Need to modify the slide and switch blade by yourself. Suitable for G19/G19x/G20/G22/G23/G26/G27/G34/G40 medium and full size frame 1-4 generation. Not suitable for slim model G42/G43X/G43/G44. Gen 5 needs to be thinner to fit on the back slot piece, Needs to be lightly machined and polished by yourself.

52.     Also displayed on the page were several MCDs which bore the Glock, Inc., trademark.



53.    The UC selected one gold MCD commonly known as a "Glock switch" and was directed to a checkout page, where they entered their shipping, billing, and payment information. Following this, the UC was able to successfully complete the purchase via credit card.

54.    Between May 22, 2025, and June 11, 2025, the UC messaged a MCD Vendor on Signal and was provided with a tracking number for their order.

55.    Using the information provided by the MCD Vendor, the UC learned their package was a United States Postal Service package. Furthermore, the tracking for the package showed it originated in China, transited to Los Angeles, California, and then was delivered to the UC mailbox in Boston, Massachusetts, on June 16, 2025.

56.    On June 18, 2025, United States Postal Inspect Service Inspector Andrew Yanchus, who is assigned to the Boston Field Office, responded to the UC mailbox and observed the USPS package which was a brown box.

57.     Inspector Yanchus opened the package and observed a Kovar Portable Camp Stove within. Inspector Yanchus removed the top of the camp stove and concealed within was a gold MCD bearing Glock, Inc.'s trademarked logo.



58.     U.S. Customs and Border Protection ("CBP") advised that the UC order was not declared within the CBP database, meaning the MCD was smuggled into the United States. Based on available data, CBP surmised the UC package entered the United States via a UPS shipment. Within this shipment were three packages weighing 15.90 KG and a cargo description[11] of LEATHER+METAL WATCH BAND. This description is inaccurate and does not describe the actual item which was shipped.[12] Furthermore, the shipping company did not declare the UC order. Instead, it was smuggled with other items.

### July 2025: Identification of TCO Using Cryptocurrency

59.     In July 2025, the UC visited **Subject Domain 1** and observed the website displaying

---

[11] The company shipping items to the United States provides the cargo description to Customs when completing entry forms.

[12] Through my training and experience I know companies shipping illegal items into the United States will inaccurately describe the items to help avoid detection by CBP because if accurately described, they would be easily seized.

an advertisement stating they were now accepting cryptocurrency as payment and that with the use of cryptocurrency, users received a 10% discount.

60.    After learning this information, the UC messaged the following two accounts known to be used by the Reece/Doly TCO: 1) the "Reece Telegram Account"; and 2) the "Doly Signal Account."

61.    In July 2025, the UC messaged the Reece Telegram Account to purchase an MCD. In response, the Reece Telegram Account sent a picture of multiple MCDs in various colors. Furthermore, the Reece Telegram Account asked the UC if they need to purchase an MCD using cryptocurrency and advised the UC that they accept "btc.eth.sol.twt.bnb.usdt.usdc"[13].

62.    Continuing in July 2025, on two occasions, the Reece Telegram Account provided the UC with the Bitcoin ("BTC") address ███████████████████54q2 ("BTC Address 54q2") to pay for the MCD.

63.    In July 2025, the UC messaged the Doly Signal Account and discussed the purchase of MCDs. During the conversation, the Doly Signal Account provided the UC with the BTC address ███████████████████w8h ("BTC Address 2w8h") to pay for an MCD.

### July 30, 2025: Undercover Purchase of an MCD from **Subject Domain 2**

64.    On July 30, 2025, the UC conducted an undercover purchase of an MCD, commonly known as a Glock switch, utilizing **Subject Domain 2**.

---

[13] All the listed acronyms are abbreviations for types of cryptocurrency.

65. The UC visited **Subject Domain 2** and clicked on one of the one of the MCD pictures titled "Stainless steel glock full-auto selector adjusts full-auto and semi-auto modes suitable for G19/G19x/G20/G22/G23/G26/G27/G34/G40 medium and full size frame 1-4 generation."



66. Within the listing were pictures of several different types and colors of MCDs, some of which bore Glock, Inc.'s trademarked logo.

67. Just under the title of the listing was the following information.

The glock switch can be used to switch the firing mode of the glock pistol, freely switching between full-automatic and semi-automatic modes. Need to modify the slide and switch blade by yourself suitable for G19/G19x/G20/G22/G23/G26/G27/G34/G40 medium and full size frame 1-4 generation Not suitable for slim model G42/G43x/G43/G44 gen 5 needs to be thinner to fit on the back slot piece, needs to be lightly machined and polished by yourself.

68. The listing had several different MCDs options to choose from including:

a. Hidden Flat Back $228 (displayed picture of "Glock switch");

b. Flat Back $108 (displayed picture of "Glock switch");

c. Black $78 (displayed picture of "Glock switch");

d. Red Aluminum $88 (displayed picture of "Glock switch");

    e.      Gold $88 (displayed picture of "Glock switch");

    f.      Blue $88 (displayed picture of "Glock switch");

    g.      Rose Gold $88 (displayed picture of "Glock switch");

    h.      Purple $88 (displayed picture of "Glock switch");

    i.      Green $88 (displayed picture of "Glock switch"); and

    j.      Black Type 3 $80 (displayed picture of "auto sear").

69.     The UC selected one "Gold" and one "A Black Type 3" and clicked "Buy Now," at which point they were directed to enter their shipping and payment information.

70.     Once the payment processed, the UC observed a page stating, "Thank you! Your payment is complete." This page displayed the UC's order number, email, payment method, shipping/billing address, and shipping method. While still signed into their account, the UC clicked on their profile icon, selected "My Orders" and was able to view a history of orders dating back to March 3, 2025.[14]

71.     On August 6, 2025, the UC received an email which contained a UPS tracking number for their order. The tracking information and UC address were provided to United States Customs and Border Protection ("CBP") at its National Targeting Center ("NTC"), which reviewed their database but did not observe an international shipment to the UC address.

72.     The UC monitored the UPS tracking number via the UPS website and observed the label for the package was created on August 4, 2025. On August 13, 2025, UPS indicated they had the package in Oakland, California. On August 19, 2025, the package was delivered to the UC address in Boston, Massachusetts.

73.     Based on this information, investigators believe that the UC's order was smuggled into the United States to a warehouse. Once at the warehouse, the order was put into the domestic UPS mail stream.

_____

[14] The previous orders were from Subject Domain 1 and cnszzhs[.]com.

74.     On August 25, 2025, an investigator retrieved the UC's order, which was a brown box with a UPS label displaying the UC's name and address.

75.     Investigators opened the package and observed two "Portable Card Type Stove" boxes. Within each box was a metal portable stove. Upon removing the tops of the stoves, investigators observed a metal box attached to the inside wall via screws and tape. Investigators removed the box and observed an MCD concealed within each. One MCD was commonly known as an "auto sear" and the other a "Glock switch" which bore Glock, Inc.'s trademarked logo.

 

September 2025: The UC Bought an MCD from the Reece Telegram Account Using Cryptocurrency

76.     In September 2025, the UC messaged the Reece Telegram Account and inquired about purchasing an MCD using cryptocurrency as the payment form. A portion of the conversation is outlined below which ultimately led to the purchase of one MCD on or about September 4, 2025.

*UC: Hey can I buy a Glock switch with crypto today?*

*Reece Telegram Account: Hello, my friend. Do you need to use bitcoin for transactions?*

*UC: Yes*

*Reece Telegram Account: What color do you need?*

*UC: what colors are available?*

*Reece Telegram Account: [Picture of multiple MCDs of different colors][15]*

*UC: Picture won't load. Do you have green?*

*Reece Telegram Account: yes*

*Reece Telegram Account: 1 green 1\*$88 + shipping $35 + handling $6.15 = $129.15*

*Reece Telegram Account: The discount for cryptocurrency transactions is 10% so $129.15\*0.9 =$116.24 $116.235*

*Reece Telegram Account:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *54q2*

77.    On or about September 4, 2025, the UC transferred $116.74 (0.00106 BTC) to BTC Address 54q2 provided by the Reece Telegram Account.

<u>September 2025: The UC Bought an MCD from the Doly Signal Account Using Cryptocurrency</u>

78.    In September 2025, the UC messaged the Doly Signal Account and inquired about purchasing an MCD using cryptocurrency as the payment form. A portion of the conversation that ultimately led to the purchase of one MCD on or about September 4, 2025, appears below.

*UC: Hey can I buy a Glock switch with crypto today?*

*Doly Signal Account: yes how many do u need*

*UC: Just one*

*Doly Signal Account: What color do you need*

*UC: what options are there?*

*Doly Signal Account: [picture of multiple MCDs of different colors]*

*Doly Signal Account: the price of cryptocurrency trading after enjoying a 10% discount is $105.65*

*Doly Signal Account:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *2w8h*

---

[15] This picture would not initially load for the UC.

*Doly Signal Account: this is the receiving address for bitcoin. After you make the payment please take a screenshot and send it to me, and I'll fill in your delivery address*

*UC: Ok I want a blue one so $105.65?*

*Doly Signal Account: Yes bro*

*UC: sending the money in a few min can you tell me the exact bitcoin amount*

*UC: Pictures of BTC transactions*

*UC: UC address and phone number*

*Doly Signal Account: ok my friend have you transferred it?*

*Doly Signal Account: Ok bro I will ship it today*

79.    On September 4, 2025, the UC transferred $105.90 (0.0009617 BTC) to the BTC Address 2w8h provided by the Doly Signal Account.

### September 2025: Seizure of MCDs from Undercover Orders

80.    Using the tracking numbers provided by the MCD vendors, the UC was able to see their package originated in China and transited to the United States. Furthermore, the tracking information showed the package transited from China to Los Angeles, California, in one day.

81.    Following the order of MCDs, HSI provided an undercover address to CBP's National Targeting Center ("NTC"), which is responsible for identifying, analyzing, and seizing prohibited cargo entering the United States. NTC monitored the undercover address and did not observe any packages entering the United States from China. As mentioned above, the UC was tracking the package via the tracking number provided by the MCD vendor and could see it had transited from China and was now in the United States. Through my training and experience, I know if the package was appropriately declared, it should have populated in CBP databases. As the package did not so populate, investigators believe that it had been smuggled into the United States. This belief is based off my experience with previous undercover orders and knowledge of the CBP system. During

previous undercover orders of MCDs, which were shipped from China, someone declared packages with CBP. This means the importer or broker filed paperwork, which among other things, identified the contents of the package and its destination. Such information is required for international shipments imported into the United States, because it allows CBP to determine what (if any) tariffs will be applied and to determine if the items are permitted to be imported into the United States.

82.     On September 22, 2025, investigators retrieved the UC's order from the undercover mailbox and observed it was a brown FedEx Box. Investigators opened the package and observed that it contained a white box that had a plastic bubble wrapped screwdriver set inside. Within the screwdriver set, there were two small metal boxes.[16]

83.     Upon opening the metal boxes, investigators observed they were drilled out to fit a singular MCD. In total, investigators found one blue and one green MCD both bearing Glock, Inc.'s trademarked logo.[17]

Fall 2025: Tracing Cryptocurrency from the Reece Telegram Account UC Order of MCDs

84.     As noted above, on September 4, 2025, the UC sent a transfer of 0.00106 BTC ($116.38) to the MCD vendors BTC address 54q2. The transaction was uniquely identified by the transaction hash 32baef5b22cc502bcda35939804b366e38a3f9f919792e7507362350f742af98.[18]

85.     Following the transaction, the funds were then transferred to an OKX deposit address identified as:

> OKX Deposit Address: 3QXPuCB6n ███████████████ ("3QXPuCB6n wallet")

---

[16] Investigators have previously observed these metal boxes to conceal MCDs.

[17] The Reece/Doly TCO advised the individual orders placed by the UC were combined into one order as they observed the same shipping address when packaging the MCDs.

[18] The source wallet BTC address 54q2 has received approximately $5,240.27 (0.05170522 BTC) across twenty-five transactions during the same timeframe.

Transfer Date: September 5, 2025 @ 00:15

TransactionHash:
0de18a7f2183d0d6ef192203713b9174f43dad99c3df6c4670c4eac638b104fc

86.      In October 2025, HSI NE issued a summons to OXK to identify the account who received the above transaction. OKX's response showed the owner of 3QXPuCB6n wallet is Shen LIU (YOB: 1996).

87.      The data also included a Chinese Identification Card for the account owner along with a selfie photo of the individual. Comparing the two photographs, I recognized the individual depicted in the selfie style photograph to be the same individual on the Chinese Identification Card that was used to open a PayPal account associated with previous undercover purchases of MCDs. Furthermore, as noted above, LIU is the same individual who opened the PayPal account which had received funds for previous undercover purchases of MCDs.

### Fall 2025: Tracing Cryptocurrency from the Doly Signal Account UC Order of MCDs

88.      As noted above, on September 4, 2025, the UC sent a transfer of 0.00096179 BTC ($105.64) to the MCD vendor's BTC address 2w8h. The transaction was uniquely identified by the transaction hash fd11123b1581dee157fe1ea74393581a273b9c0b6260c005c1e963a98528a12c.

89.      Following the transaction, the funds were then transferred to a deposit address at OKX exchange identified as:

OKX Deposit Address
bc1qqaympca507▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
("bc1qqaympca507")

Transfer Date: 09/05/2025 @ 01:29

Transaction Hash:
cdf7dbdce686a653a67200cbc79a3d622d153ea85316a104bdbadc25fdb508b2

90.      In October 2025, HSI issued a summons to OXK to identify the account that received

the above transaction. OKX's response showed the owner of the bc1qqaympca507 wallet is Dong LI DENG (YOB: 1997).

91.    The data also included a Chinese Identification Card for the account owner along with a selfie photo of the individual. Comparing the two photographs, I recognized the individual depicted in the selfie style photograph to be the same individual on the Chinese Identification Card used to open a PayPal account associated with previous undercover purchases of MCDs. Furthermore, DENG is the same individual who opened the PayPal account which had received funds for previous purchases of MCDs by the UC.

November 5, 2025: The <strong>Target Accounts</strong> are Frozen.

92.    On or about November 5, 2025, OKX placed a voluntary freeze on the **Target Accounts** pending a documented official request (*i.e.*, a seizure warrant or court order) for the **Target Accounts** funds.[19]

Glock, Inc.

93.    On November 12, 2025, an investigator queried the United States Patent & Trademark ("USPTO") website[20] and observed one hundred and sixty-two registered trademarks for Glock, Inc. Through a review of Glock, Inc.'s trademarks, I am aware that the **Subject Domains** violate a trademark registered by Glock, Inc., which is the trademarked Glock logo on any merchandise.[21]  The

---

[19] As explained below, OKX is a cryptocurrency exchange that allows customers to buy, sell, exchange, and transfer a variety of cryptocurrencies. OKX is registered in the Seychelles and, therefore, not subject to U.S. jurisdiction and cannot be compelled by U.S. process. However, as stated, OKX has placed a voluntary freeze on the **Target Accounts** and is willing to release those assets to U.S. law enforcement authorities upon receipt of a lawful order issued by a U.S. Magistrate Judge.

[20] https://tmsearch.uspto.gov

[21] The use of the Glock logo. US Registration Number 6831174.

**Subject Domains** are violating this trademark by displaying it on their websites and by facilitating the sale of MCDs that display a spurious use of Glock, Inc.'s trademark.

Control of the <b>Subject Domains</b>

94.    A search of publicly available WHOIS domain name registration records revealed the date on which the **Subject Domains** were registered as well as the registrars and the registrants.

95.    **Subject Domain 1** is registered with NameSilo, LLC, a company located in Phoenix, Arizona, in the United States. **Subject Domain 2** is registered with Name SRS AB in Sweden.

96.    **Subject Domain 1** was registered on May 5, 2025, and its registration expires on May 5, 2026. **Subject Domain 2** was registered on July 5, 2025, and its registration expires on July 5, 2026.

97.    The top-level domain for **Subject Domain 1** is .xyz, which is managed by XYZ.com LLC, a company located at 4425 Spring Mountain Road, Suite 2, Las Vegas, Nevada 89102.

98.    The top-level domain for **Subject Domain 2** is .com., which is managed by Verisign, a company located at 12061 Bluemont Way, Reston, Virginia 20190.

<b><i>SEIZURE PROCEDURE FOR THE TARGET ACCOUNTS</i></b>

99.    Should this seizure warrant be granted, law enforcement intends to work with OKX to seize approximately $3,353.87 (Account              8317) and $2,743.15 (Account              88724) associated with the **Target Accounts**. The signed seizure warrants would be transmitted to OKX along with wallet addresses which are controlled by HSI. OKX would transfer the cryptocurrency in the **Target Accounts** to the HSI controlled wallets. The seized currency will remain in the custody of HSI during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

## *SEIZURE PROCEDURE FOR THE SUBJECT DOMAINS*

100.     As detailed in Attachment A-5 and Attachment A-6, upon execution of the seizure warrants, the registry or registrar for the **Subject Domains**, or top-level domain, shall be directed to restrain and lock the **Subject Domains** pending transfer of all right, title, and interest in the **Subject Domains** to the United States upon completion of forfeiture proceedings, to ensure that changes to the **Subject Domains** cannot be made absent court order or, if forfeited to the United States, without prior consultation with HSI.

101.     In addition, upon seizure of the **Subject Domains** by HSI, the registry, registrar, or top-level domain will be directed to point the **Subject Domains** to a particular IP address, which will display a web page notifying users that the **Subject Domains** have been seized.

102.     The registry, registrar, or top-level domain also maintain certain records relating to the owner of each domain name for which it is the top-level registry (the "Domain Name Records"), including the **Subject Domains.** Certain of these records are available to the public through a "Whois" lookup through a web browser, among other means.  At the time the **Subject Domains** are seized, the registry, registrar, or top-level domain will be directed to change the "Technical Contact" and "Administrative Contact" fields of the Domain Name Records for the **Subject Domains** to contact information relating to HSI to reflect the fact that the **Subject Domains** have been seized, and to change the name server fields of the Domain Name Records to effect the forgoing changes.  All other fields will be changed so that they do not reflect any individual or entity.

103.     Upon completion of forfeiture proceedings, all Domain Name Records for the **Subject Domains** maintained by registry, registrar, or top-level domain will be changed to reflect the transfer of ownership to the U.S. government.

## *CONCLUSION*

Based upon the foregoing, probable cause exists to believe that: the funds held in or on behalf of the **Target Accounts** and the **Subject Domains** are property used in and/or intended to be used in facilitating and/or committing violations of 18 U.S.C. § 545 (Smuggling goods into the United States) and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods or services). Therefore, both the **Target Accounts** and the **Subject Domains** are subject to seizure pursuant to 19 U.S.C. § 1595a(a) and 18 U.S.C. §§ 2323(a)(1)(B) and 2323(b)(1).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Adam Rayho /by Paul G. Levenson
Adam Rayho
Special Agent
Homeland Security Investigations

Subscribed and sworn to me telephonically this the ___10th___ day of December, 2025.

Honorable Paul G. Levenson
United States Magistrate Judge